## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHRISTINE M. LOGSDON,<br><br>                    Plaintiff,<br><br>      v.<br><br>UNIVERSITY OF PITTSBURGH MEDICAL CENTER and UNIVERSITY OF PITTSBURGH PHYSICIANS,<br><br>                    Defendants. | Civil Action No.:<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Christine M. Logsdon, by her attorneys, Stember Cohn & Davidson-Welling, LLC, brings the following Complaint against Defendants University of Pittsburgh Medical Center ("UPMC") and University of Pittsburgh Physicians ("UPP") (together, "Defendants"), and alleges the following in support:

## PRELIMINARY STATEMENT

1.      Plaintiff Christine M. Logsdon ("Logsdon" or "Plaintiff") brings this civil action against Defendants, which employed her until her termination on or about June 19, 2014.

2.      As set forth in greater detail below, Defendants denied Logsdon's requests for reasonable accommodations for her disability, refused to engage in the interactive process regarding Logsdon's requests, and terminated Plaintiff: (1) because of her disability; and (2) because she sought accommodation for her disabilities.

3.      Defendants' actions violate the Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C. § 12101 *et. seq.*; the Pennsylvania Human Relations Act ("PHRA"), 43 P.S.

§ 951 *et. seq.*; and the Rehabilitation Act of 1973 ("Rehabilitation Act"), as amended, 29 U.S.C. § 701 *et seq*.

## PARTIES

4.      Plaintiff is an adult individual who resides in Allegheny County, Pennsylvania.

5.      Defendant UPMC is a non-profit corporation organized under the laws of the Commonwealth of Pennsylvania, with a principal place of business at 200 Lothrop Street, Pittsburgh, PA 15213.

6.      Defendant University of Pittsburgh Physicians ("UPP") is a division of UPMC that provides healthcare services through physicians practicing in various medical specialties.

7.      While Defendants classified Logsdon as a UPP employee, UPMC and UPP jointly employed Logsdon at all relevant times. Among other things, UPMC set the terms of Logsdon's employment, including the establishment, interpretation, application, and enforcement of UPMC policies that pertained to Logsdon's employment.

8.      At all relevant times, Defendants, individually and in combination, employed more than 50 employees.

9.      At all relevant times, Defendants, individually and in combination, operated as Logsdon's "Employer" within the meaning of the ADA, the PHRA and the Rehabilitation Act.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over her related state law claims under 28 U.S.C. § 1367.

11.     Pursuant to 28 U.S.C. § 1391, venue is proper in the United States District Court for the Western District of Pennsylvania, as the facts and causes of action asserted arose from

events that occurred in Allegheny County, Pennsylvania, and because Defendants are both headquartered in Allegheny County.

## FACTS

12.     At all relevant times, Logsdon has been an individual with a disability, within the meaning of the ADA, the PHRA and the Rehabilitation Act, in that she suffers from medical conditions that substantially limit one or more major life activities.

13.     Specifically, Logsdon has been diagnosed with rheumatoid arthritis, which substantially limits, *inter alia*, the proper functioning of Logsdon's immune system. Logsdon has also been diagnosed with fibromyalgia, which substantially limits, *inter alia*, Logsdon's neurological function.

14.     The proper functioning of one's immune and neurological systems are both "major life functions" within the meaning of the ADA. *See* 42 U.S.C. § 12102(2)(B).

15.     Logsdon's medical conditions also limit her ability to work.

16.     Occasionally, Logsdon is forced to miss work due to a sudden change in her condition, or because of side effects of necessary medication.

17.     For example, Logsdon takes a medication known as methotrexate, which is used to treat rheumatoid arthritis. However, because methotrexate is an immunosuppressant — meaning that it suppresses the body's immune response — Logsdon is at greater risk of contracting viral infections.

18.     Defendants hired Logsdon in or around February 2013. Shortly thereafter, Logsdon told her supervisor, Gina Angel, of her medical conditions and explained why they can occasionally cause her absence from work.

19.     Defendants initially hired Logsdon to work as a medical coder (with the title "Coder I"). However, shortly after her employment began, Defendants changed Logsdon's formal title and job duties to "Contact Center Specialist."

20.     As a Contact Center Specialist, Logsdon worked within Defendants' 24-hour answering service for various UPP medical practices. In that role, Logsdon was responsible for answering and addressing patients calls made after their medical providers' normal business hours. Essentially, Logsdon would receive patients' calls, and either take their message or re-direct their call to the appropriate line. If the matter was urgent, she would page the appropriate medical professional on-call at the time.

21.     With respect to her job duties, Logsdon was a "solid, strong" performer. Gina Angel, her direct supervisor, described her as a "competent" employee who "can be entrusted to use good judgement."

22.     Indeed, Logsdon received numerous accolades for her strong performance, including a customer service award in October 2013.

23.     However, while Defendants found Logsdon's performance acceptable, they took issue with her attendance.

24.     Specifically, during her first year of employment, Logsdon was absent from work several times, in part due to complications and flare-ups of her rheumatoid arthritis and fibromyalgia.

25.     For example, on December 17 and 18, 2013, Logsdon missed two days from work because she contracted influenza. As noted above, Logsdon is more susceptible to, and regularly contracts, such illnesses due to the immunosuppressant medication she takes for her rheumatoid arthritis.

26.     Because Logsdon's medical condition was requiring time off work, Gina Angel suggested that Logsdon apply for leave under the Family Medical Leave Act ("FMLA").

27.     On December 17, 2013, following Angel's suggestion, Logsdon sent a message to Defendants' Human Resources department to determine the best course of action.

28.     In her message, Logsdon wrote:

> I am a casual employee here with UPMC. I currently have Rheumatoid arthritis and fibromyalgia. The medication I am on suppresses my immune system, so I get sick a lot. Do I qualify for the disabilities act or family medical leave to use toward my abscences [sic]? For the new abscence [sic] policy that UPMC has started, I currently have my 2nd abscence [sic] and I am only allowed 3 in a 6 month period. Any assistance would be greatly appreciated.

29.     The following day, Logsdon received a response from Jill Barnabei, Defendants' Leave Specialist:

> You would not qualify for the FMLA until you have worked for UPMC for 12 months and worked 1,250 hours in the previous 12-month period; also, you will not qualify for Personal Leave because of your Limited Casual status. However, you may be eligible for an ADA accommodation. Please contact our Call Center at 1-800-633-1197, they can help you file for a leave of absence, once your leave of absence request has been denied we can send you the ADA paperwork to be completed. Once the ADA paperwork has been submitted, we can begin our review.

30.     Following Barnabei's suggestion, Logsdon promptly applied for FMLA leave, expecting to be denied and provided with the relevant "ADA paperwork" (i.e., paperwork utilized by Defendants to address requests for ADA accommodation).

31.     As of February 1, 2014, Logsdon had received no response to her FMLA application, nor any ADA paperwork, so she notified Barnabei.

32.     On February 2, 2014, Logsdon's condition caused her to be absent. Following Defendants' procedures, Logsdon promptly notified her supervisors of her absence.

33.     The same day, at 9:26 a.m., Gina Angel emailed Logsdon:

Christine,
I am going to need a statement on the following call offs as soon as
possible.

11/20/13
12/17/13- 12/19/13
2/2/13

Thank you,
Gina

34.     Logsdon responded that day, asking about the request pertaining to December 17–

19, 2013, because she had already provided a note from her doctor.

35.     Gina Angel replied: "I still need a statement.  A dr's excuse does not keep

someone from being disciplined."

36.     The next day, February 3, 2014, Barnabei sent Logsdon the "ADA paperwork"

she had mentioned. Logsdon promptly completed and submitted that paperwork.

37.     On February 6, 2014, Logsdon responded to Gina Angel's request for a

"statement" regarding her absences and explained that she was in the process of requesting an

accommodation under the ADA.

38.     On February 20, 2014, Logsdon went to the Allegheny General Hospital

emergency room, seeking medical attention because of extreme pain in her chest, which

interfered with her breathing. Logsdon's physician advised her to rest and stay off work until

February 23, 2014.  As a result, Logsdon missed two scheduled work days (February 20 and 22).

39.     On March 4, 2014, Kelly Dennis, a UPMC Disability Management Coordinator,

finally responded to Logsdon's accommodation request. She asked Logsdon to complete several

forms authorizing the disclosure of her medical records so that UPMC could "see if your request

is medically supported under the ADA." Logsdon promptly completed and returned those forms.

40.     On March 18, 2014, Gina Angel issued Logsdon a "Final Written Warning — in lieu of suspension." The Final Written Warning was issued because of Logsdon's absences on the following dates: October 26, 2013; November 20, 2013; December 17–18, 2013; February 20–22, 2014. (A copy of the Final Written Warning is attached as **Exhibit A**.)

41.     On March 21, 2014, Logsdon emailed Kelly Dennis to ask whether her accommodation request had been approved. Dennis responded that she was "still waiting for the fax from your physician to assist with the frequency and duration of this accommodation" and that she would proceed "[a]s soon as I receive the information I need from Dr Wasko."

42.     On March 25, 2014, Logsdon filed an internal UPMC grievance in response to the Final Written Warning, explaining that her absences were related to her medical condition.

43.     Along with her grievance, Logsdon provided a note from Amy Dix, CRNP at the Lupus Center of Excellence — where Logsdon's treating physician Dr. Mary Wasko practices rheumatology — who explained how Logsdon's immunosuppressant medication makes her vulnerable to infections. (Amy Dix's note is attached as **Exhibit B**.)

44.     Defendants denied Logsdon's grievance, and upheld the discipline.

45.     In April and May 2014, Logsdon received several letters from Defendants indicating that they had not received the medical documentation requested from her physician. Logsdon forwarded those letters to her physician, requesting that the records be sent as soon as possible.

46.     On or about May 24, 2014, Logsdon again experienced a flare-up of her rheumatoid arthritis, and she had to miss work.

47.     On May 28, 2014, Location Supervisor Lisa Perevuznik emailed Logsdon to ask whether her May 24 absence was covered by FMLA. Logsdon responded, saying "[i]t was due to an RA flare. I do not qualify for FMLA and they are still waiting on medical records for ADA."

48.     On May 30, 2014, Gina Angel emailed Logsdon the following:

> Christine,
> I need to know asap if your call off was fmla or not.
> Please email me back tonight when you are working.
> Gina

49.     Logsdon promptly replied:

> I called off due to an RA flare. I was in bed, in pain and swollen all
> day. I was told several months ago I do not qualify for FMLA
> unless I put in an X number of hrs. I am still waiting on the ADA
> to be put through.

50.     In June 2014, Logsdon experienced two additional flare-ups of her rheumatoid arthritis, requiring her to miss work on June 7–8, and 14.

51.     For those absences, Logsdon provided an "excuse" from Dr. Moira Davenport of Allegheny General Hospital.

52.     On June 16, 2014, Gina Angel email Logsdon the following:

> Christine,
>
> I need statements from you regarding why you called off on 6/7,
> 6/8 & 6/14.
> Please provide to me as soon as possible.
> Thank you,
>
> Gina

53.     The same day, Kelly Dennis sent Logsdon a letter stating that Defendants were unable to approve Logsdon's accommodation request, with the following explanation:

> We have requested that your Treating physician complete a
> Medical Inquiry Form on 04/16/14 and also on 06/05/2014;
> however we have not received a response. WorkPartners has made
> every effort to obtain this information from your treating provider.

Your physician failed to send us medical documentation
supporting your need for continued accommodation; therefore we
are not able to make a decision regarding your accommodation
request. We have approved and protected your reported absences
on 02/02/2014 and 03/11/2014 during our investigation of your
request. We are unable to provide any ongoing job protection in
the form of Intermittent Accommodated Time from Work moving
forward.

(Kelly Dennis's June 16, 2014 letter is attached as **Exhibit C**.)

54.     On June 16, 2014, Logsdon contacted the Lupus Center to find out why her

medical records had not been provided to Defendants.

55.     The Lupus Center's administrator advised Logsdon that the records had already

been sent twice.

56.     In fact, and unbeknownst to Logsdon, the Lupus Center's third-party records

administrator had attempted to send the records **twice**, first on March 12, 2014, and again on

May 29, 2014. The administrator made the records available to Defendants upon payment of a

$27.02 invoice.

57.     On June 19, 2014, Defendants terminated Logsdon, and notified her via letter

from Gina Angel. Angel noted that Logsdon "had requested an accommodation under the UPMC

Centralized Accommodation Process, but since no response was received from your treating

physician, you were notified on June 16, 2014 that they are unable to provide ongoing job

protection in the form of Intermittent Accommodated Time from work." (Gina Angel's June 19,

2014 letter is attached as **Exhibit D**.)

58.     According to Angel's letter, the "final straw" prompting Logsdon's termination

were here absences on June 6–7, and 14.

59.     Prior to filing this action, Plaintiff exhausted her administrative remedies by dual-filing charges with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC").

60.     In the course of the EEOC's investigation, it was revealed that on June 24, 2014 — just five days after Defendants terminated Logsdon — UPMC finally paid the $27.02 invoice necessary to receive Logsdon's medical documentation. (A copy of the EEOC's determination letter is attached as **Exhibit E**.)

61.     Defendants — who are the largest providers of medical services in the region — knew that Logsdon had a disability for which she was receiving regular medical treatment. Indeed, Logsdon provided numerous excuses, notes and other documentation from her medical providers to demonstrate that the reasons for her occasional absences.

62.     Logsdon requested that Defendants accommodate her occasional need for absences. Instead of granting that request, Defendants threw up roadblock after roadblock, demanding that Logsdon provide them with access to redundant medical records. When Logsdon complied, Defendants willfully avoided receipt of those records, and misled Logsdon into thinking they had never been sent. Defendants then terminated Logsdon for "excessive absences."

63.     Despite receiving documentation directly from Logsdon — and never once bothering to follow-up with her treating physician — Defendants pretended that their refusal to accommodate was solely based on the lack of medical records. After delaying inexplicably until a week after her termination, Defendants paid for and obtained Logsdon's medical records. Instead of contacting Logsdon to reinstate her, Defendants did nothing.

64.     In short, Defendants intentionally discriminated against Logsdon by refusing to accommodate her disability, and terminating her because of her disability.

65.     As a result of Defendant's discrimination, Logsdon has suffered, and will continue to suffer, a substantial loss of earnings, including, but not limited to, loss of salary, benefits, and other emoluments of employment.

66.     As a further direct and proximate cause of Defendants' disability discrimination, Logsdon has experienced significant emotional distress.

67.     Defendants acted willfully and in reckless disregard of Logsdon's rights under the the ADA, the Rehabilitation Act, and the PHRA by denying her reasonable accommodations, and by discharging her on account of her disability, her perceived disability and/or her record of disability.

## COUNT I — VIOLATION OF PENNSYLVANIA HUMAN RELATIONS ACT
### (Disability Discrimination) (Against all Defendants)

68.     The foregoing paragraphs are incorporated by reference.

69.     At all relevant times, Defendants were an "employer" within the meaning of the PHRA.

70.     At all relevant times, Plaintiff's medical conditions rendered her an individual with a disability under the PHRA.

71.     At all relevant times, Plaintiff was perceived by Defendants to be suffering from a disability.

72.     Plaintiff was terminated by Defendants because she suffered from a disability, had a record of having a disability, and/or because Defendants regarded her as disabled.

73.     As a result of Defendants' actions as described above, Defendants violated the PHRA, causing Plaintiff to suffer damages.

## COUNT II — VIOLATION OF PENNSYLVANIA HUMAN RELATIONS ACT
### (Failure to Accommodate) (Against all Defendants)

74.     The foregoing paragraphs are incorporated by reference.

75.     Plaintiff requested reasonable accommodations and submitted paperwork from her healthcare providers to support her request for such accommodations.

76.     Defendants could have granted Plaintiff this accommodation without undue hardship, but refused to do so, and intentionally avoided receiving the medical documentation that Defendants demanded from Plaintiff.

77.     Although Defendants denied Plaintiff's requested accommodation, Defendants did not propose alternative accommodations or otherwise engage in the interactive process.

78.     As a result of Defendants' actions as described above, Defendants violated the PHRA, causing Plaintiff to suffer damages.

## COUNT III — VIOLATION OF PENNSYLVANIA HUMAN RELATIONS ACT
### (Retaliation) (Against all Defendants)

79.     The foregoing paragraphs are incorporated by reference.

80.     Plaintiff requested reasonable accommodations, and submitted paperwork from her healthcare providers to support her request for such accommodations.

81.     Requesting an accommodation for a disability is a protected activity under the PHRA.

82.     Defendants based the decision to terminate Plaintiff in whole or in part on her request for reasonable accommodations and her protected complaints of discrimination.

83.     As a result of Defendants' actions as described above, Defendants violated the PHRA, causing Plaintiff to suffer damages.

## COUNT IV — VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### (Disability Discrimination) (Against all Defendants)

84.     The foregoing paragraphs are incorporated by reference.

85.     At all relevant times, Defendants were Plaintiff's "employer" within the meaning of the ADA.

86.     At all relevant times, Plaintiff's medical conditions rendered her a qualified individual with a disability under the ADA.

87.     At all relevant times, Plaintiff had a record of having a disability, of which Defendants were aware.

88.     At all relevant times, Defendants regarded Plaintiff as disabled.

89.     Defendants discriminated against Plaintiff by terminating her employment because of her disabilities, her record of disabilities, and/or because Defendants regarded her as an individual with a disability.

90.     As a result of Defendants' actions as described above, Defendants violated the ADA, causing Plaintiff to suffer damages.

## COUNT V — VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### (Failure to Accommodate) (Against all Defendants)

91.     The foregoing paragraphs are incorporated by reference.

92.     Plaintiff requested reasonable accommodations, and submitted paperwork from her healthcare providers to support her request for such accommodations.

93.     Defendants could have granted Plaintiff this accommodation without undue hardship, but refused to do so, and intentionally avoided receiving the medical documentation that Defendants demanded from Plaintiff.

94.     Although Defendants denied Plaintiff's requested accommodation, Defendants did not propose alternative accommodations or otherwise engage in the interactive process.

95.     As a result of Defendants actions as described above, Defendants violated the ADA, causing Plaintiff to suffer damages.

## COUNT VI — VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### (Retaliation) (Against all Defendants)

96.     The foregoing paragraphs are incorporated by reference.

97.     Plaintiff requested reasonable accommodations, and submitted paperwork from her healthcare providers to support her requests for such accommodations.

98.     Requesting reasonable accommodation is a protected activity under the ADA.

99.     Defendants fired Plaintiff, because of her protected activity, including her request for reasonable accommodation and reports of disability discrimination.

100.    As a result of Defendants actions as described above, Defendants violated the ADA, causing Plaintiff to suffer damages.

## COUNT VII — VIOLATION OF THE REHABILITATION ACT
### (Disability Discrimination) (Against all Defendants)

101.    The foregoing paragraphs are incorporated by reference.

102.    At all relevant times, Defendants were Plaintiff's "employer" within the meaning of the Rehabilitation Act.

103.    At all relevant times, Plaintiff's medical conditions rendered her a qualified individual with a disability under the Rehabilitation Act.

104.    At all relevant times, Defendants regarded Plaintiff as disabled.

105.    Defendants discriminated against Plaintiff by terminating her employment because of her disabilities and/or because Defendants regarded her as an individual with a disability.

106.    As a result of Defendants' actions as described above, Defendants violated the Rehabilitation Act, causing Plaintiff to suffer damages.

### COUNT VIII — VIOLATION OF THE REHABILITATION ACT
**(Failure to Accommodate) (Against all Defendants)**

107.    The foregoing paragraphs are incorporated by reference.

108.    Plaintiff requested reasonable accommodation, and submitted paperwork from her healthcare providers to support her request for such accommodations.

109.    Defendants could have granted Plaintiff's requests without undue hardship, but refused to do so.

110.    Although Defendants denied Plaintiff's requested accommodation, Defendants did not propose alternative accommodations or otherwise engage in the interactive process.

111.    As a result of Defendants' actions as described above, Defendants violated the Rehabilitation Act, causing Plaintiff to suffer damages.

### COUNT IX — VIOLATION OF THE REHABILITATION ACT
**(Retaliation) (Against all Defendants)**

112.    The foregoing paragraphs are incorporated by reference.

113.     Plaintiff requested reasonable accommodations, and submitted paperwork from her healthcare providers to support her requests for such accommodations.

114.     Requesting reasonable accommodation is a protected activity under the ADA.

115.     Defendants fired Plaintiff because of her protected activity, including her request for reasonable accommodation.

116.     As a result of Defendants actions as described above, Defendants violated the Rehabilitation Act, causing Plaintiff to suffer damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Logsdon respectfully requests that the Court find in her favor on all counts, enter judgment on her behalf, and award her:

a)     Back pay and front pay, lost benefits and emoluments of employment;

b)     General, consequential and compensatory damages;

c)     Liquidated damages;

d)     Punitive damages;

e)     Medical and related expenses;

f)     Interest and costs of this action;

g)     Reasonable attorneys' fees; and

h)     Any other relief that the Court considers proper.

Respectfully submitted,

Dated: December 18, 2017

/s/Vincent J. Mersich

Vincent J. Mersich, Esquire
PA ID No. 310971
vmersich@stembercohn.com
Jonathon Cohn, Esquire
PA ID No. 92755
jcohn@stembercohn.com
**STEMBER COHN &**
     **DAVIDSON-WELLING, LLC**
The Hartley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA  15219
T.:  (412) 338-1445
F.:  (412) 338-1446

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CHRISTINE M. LOGSDON, | Civil Action No.: |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| UNIVERSITY OF PITTSBURGH MEDICAL CENTER and UNIVERSITY OF PITTSBURGH PHYSICIANS, | |
| Defendants. | |

## DEMAND FOR TRIAL JURY

Plaintiff hereby demands a jury trial on all issues so triable in the above-captioned action.

Respectfully submitted,

Dated: December 18, 2017

/s/Vincent J. Mersich
Vincent J. Mersich, Esquire
PA ID No. 310971
vmersich@stembercohn.com
Jonathon Cohn, Esquire
PA ID No. 92755
jcohn@stembercohn.com
**STEMBER COHN &**
        **DAVIDSON-WELLING, LLC**
The Hartley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA  15219
T.:  (412) 338-1445
F.:  (412) 338-1446

*Attorneys for Plaintiff*